The next case on today's docket is the case of the people of the state of Illinois v. Harry Schauf and we have Ms. Jennifer Cavaniss for the appellant and Ms. Sharon Chanahan for the athlete. You may begin Ms. Cavaniss. Ms. Cavaniss Good afternoon, Congress. Good afternoon. My name is Jennifer Cavaniss. For the past 23 years I've been a licensed attorney in the state of Illinois and the last 18 years I've been practicing primarily criminal law. First as a prosecutor in Macon County and now a criminal defense attorney in Jackson County. I first would like to say it's a great honor to be here today and argue this case, argue my client's case before you today. And I'm going to be arguing for the outright reversal of my client Harry L. Schauf's conviction on two counts of Class X aggravated battery firearm charge. My client is currently serving 45 years in the Department of Corrections. As a brief history of his appeal, the original appeal was assigned to the appellate defender's office. Thereafter my colleague, Attorney Paul Christensen, took over the appeal and had the appeal until his sudden stroke in August of 2011. Sometime thereafter I then took over the appeal. I filed a felon's brief and I'm now appearing before you here today for argument. The air is human and we are all aware that we all make mistakes. And as a trial attorney, I have to say I do not take fondly to allegations of ineffective assistance of trial counsel. I too have been placed under that microscope in the past, just as my colleague, Mr. Christensen, has also been in that position in the past as well. And it's never a comfortable feeling, I tell you, criticizing the trial conduct of a professional colleague. And I assure you, I did not take on this appeal merely to file spurious allegations as have been alleged. Sometimes a case will cry out for justice, even in the simplest form of fundamental fairness of proceedings. And the case at bar, Your Honor, is Harry Oshoff cries out for justice as he's serving his 45 years in prison because his trial attorney failed to effectively advocate for him, protect him, and represent him all to his detriment. And the record on appeal in this case does not reflect merely one or two isolated errors, but rather it is replete with numerous errors throughout the trial. Harry Oshoff had plausible and viable defenses to these charges. The first was self-defense as to his wife, Tina Pickens, who was one of the gunshot victims. And reckless conduct was the other defense as to Marion police officer, Steve Cannon, who also suffered gunshot wounds. However, Harry's counsel failed to present any defense theory to the jury until the closing argument. And obviously, that was too little, too late. Now, Your Honor, this case was not your usual type of domestic disturbance in Marion, Illinois. This was a domestic dispute that began between my client, Harry Oshoff, and his wife, Tina Pickens, and it ended up with a shooting incident that involved two Marion police officers and three people suffering seven gunshot wounds between them. Tina Pickens had two gunshot wounds. She had a through-and-through shot to the right arm and one in the neck. Officer Steve Cannon, he had two injuries, one to his hand, one to his cheek. And my client, Harry Oshoff, had three gunshot injuries, one to the back of the head, into the brain, one grazed over the right ear, and a gunshot wound to the chest. Now, the state alleges that Harry intentionally shot Tina two times, but there was absolutely no eyewitness testimony to this allegation and no forensic evidence to support this. Additionally, the state alleged that Harry intentionally shot Officer Cannon, but there was evidence, both medically and ballistically, that Officer Cannon was injured by a ricochet round. And Charles Wallinger, one of the lay people in the neighborhood across the street, he testified that he saw my client, Harry Oshoff, shooting down the road with his arm extended, not even looking at what he was shooting, just randomly shooting, recklessly. Now, the state has claimed that only one Marion police officer fired a shot, and that was fired by Officer Brian Maleter, who shot Harry in the back of the head. But there were also witnesses that testified that they observed either one Marion police officer fire his weapon more than once, or more than one Marion police officer fire his weapon. Can I stop you and ask you about that? Sure. Aren't those bullets accounted for? I mean, I'm sure that... Not all of them. That's the problem, I think. That is one of the problems in the case. There was one projectile removed from the front door casing. You know, what I'm talking about is, doesn't the police department have procedures where they have to account for the bullets that are spent, and they know how many bullets they have? Absolutely, that's correct. And what information came back on that? That is a problem in this case. Only one officer's gun was actually placed in evidence locker by ISP, and that was Brian Maleter, the officer who shot him in the back of the head. Now, he testified that he carried 49 rounds. When he handed over his revolver and his ammo clips, there were only 47 rounds, and there was never any explanation given for that discrepancy. And of course, Harry's counsel didn't follow up on that at all during the trial. Now, due to time limitations, I'm going to try to address just three specific issues of trial counsel's conduct that were the most damaging and severely prejudicial to my client. Number one was trial counsel's failure to object to a high volume of improper testimony throughout a five-and-a-half-day trial. There was hearsay over and over, speculation, and opinion testimony on top of repeated, cumulative testimony, wherein officers testified two, three times to the same thing over and over and over. Harry's client never objected. He objected one time to Officer Cannon's, and I believe he objected three times total during the actual trial. Number two was his lack of giving an opening statement and the unreasonableness of his decision to reserve his opening statement. Then, when he was supposed to give his opening statement after they closed the state's case, he completely failed to make an effective opening statement. It was merely two remarks, two sentences. Number three, his failure to challenge the voluntariness of Harry O'Shaugh's hospital bedside interrogation, which resulted in a statement that was used against him at trial. And he never challenged the voluntariness of this statement at pretrial, and he never advocated against the questionable circumstances that surrounded that interrogation a week after Harry was shot in the head. And to do everything he could to keep that statement out of the trial, because in fact, Your Honors, that statement alone destroyed the defense's case. It destroyed the self-defense. It also destroyed the reckless conduct. So it was extremely damaging to not challenge that statement prior to going to trial. Harry relies on the strength and wisdom of this reviewing court's opinion. In the case of People v. Lee, 1989, Justice Chapman stated that there's no right more essential than the right to assistance of counsel. And this essential right requires more than placing a warm line with a legal pedigree next to an indigent defendant. Lee remains good authority on the issue of ineffective assistance of counsel. And it doesn't matter, as the state alleges, that People v. Lee is a post-conviction petition, because it's still a violent case law. It's from this very 5th District Court. It specifically addressed ineffective assistance of trial counsel, and it eloquently discussed opening statements and cross-examinations. Excuse me one second. I'm not clear. Did the defense counsel ever give an opening statement? No. Well, he gave, he said two remarks. And what were those? He said, well, this is the longest trial we've had in Williamson County in quite some time. And then the second statement was, we think you need to hear from one final witness, which would have been a witness 37, which was actually his only defense witness. But by saying it like that, he made it sound like it was the 37th witness for the state. So, and he never raised in his opening statement any of the defenses? No. No. He only addressed those in closing, which obviously we know closing is not evidence. It's just argument. The state has said, ineffective assistance is most likely to be found when several rather than isolated errors are made by a defense attorney. This record on appeal is replete with error after error. They are not mere minor discrepancies as the state would have this court believe. Kerry O'Shaugh was not expecting a perfect trial, but he was expecting a fair one. An accumulation of all these errors required a reversal of his conviction because even if a single incident wouldn't, it's the ultimate accumulation of all these errors. And the ultimate focus of this court's inquiry should be the fundamental fairness of the proceedings that Kerry O'Shaugh was given. Now, there was so much improper testimony throughout this trial, okay? One of the most damaging inadmissible testimony occurred through the state's first three witnesses. Nine times it was said, Kerry shot Tina. Kerry Dunn shot Tina. Kerry shot Tina. Now, the severely prejudicial effect of this hearsay being allowed to come in is the fact that not one of these three witnesses even witnessed Kerry shoot Tina. They were basing it on hearsay, triple hearsay, and all that. Kerry's counsel never objected once, okay? None of these witnesses had firsthand knowledge. None of them did. There was Kerry who didn't see Kerry shoot Tina. Janice Foster didn't see Kerry shoot Tina. And Margaret Walls didn't see Kerry shoot Tina. And without any firsthand knowledge, saying Kerry shot Tina and allowing that to be heard nine times to the jury in the first day of the trial. And Tina didn't testify? She didn't testify. She was the first witness. And what did she say? The state never even asked her. They never asked her. No. All the hearsay that came in, it came in through all the police officers, okay? She was never asked about asking Kerry for the gun, which people said she did. She was never heard, she never said she was screaming for help, which others testified they heard. She was never asked if she was yelling, I've been shot, I've been shot. Were there other people there? Yes. Other people, just the two people? Yeah, just Kerry and Tina were on the porch of the house in the initial shooting. Right. You know, the initial shots fired before the police got there. Just the two of them, right? Yes. And before the police got there, though, was it her brother-in-law showed up? Dovis Kendrick. He never got up to the house. Okay, and then who? Another relative? An auntie, yes. Margaret Walls is the one who pulled up in front of the house, okay? But the initial shooting had already taken place? No. She drove off, started to drive off, and heard gunshots, then came back. Okay. And that's the problem is because she did not see Kerry shoot Tina, but yet apparently this is where all the hearsay started, okay? Now, Dovis Kendrick said he heard Tina Pickens ask Harry for the gun. She never testified to that. She was never asked that. Charles Waldron testified he heard Tina Pickens say something like, put the gun away. There again, she was never asked that, and she never testified to that. The only thing she couldn't remember was how exactly she got shot in the neck, but she specifically recalled running from the porch around the house when she got shot in the arm, and that's what she testified to. Now, how did she get shot in the arm? Did she testify to that? She believed the Marion Police Department shot her because she said she recalled being shot in the arm after she took off running from the house. Did they ever put in evidence, did the defense lawyer put in evidence that it was Tina's DNA found on the gun? Yes. He did mention that because the, I believe it was Suzanne Kidd, the forensics, she did testify that Tina's DNA was found on the gun. And that was the only gun that they had between them. Yes, yes. Now, there was so... He never argued any time the significance of that. No, no. He just mentioned it. In closing, there was so much repeat and cumulative testimony. If you look at the record, you will see that each officer testified  And the fact is, some of them testified even again, well, actually all of them did, because cross-examination of all the police officers were identical to the direct examination. It was merely a purity of the direct. There was no substantial cross-examination, no mean cross-examination. It was basically all direct exam testimony. And the danger that you get with that is you're lending credibility. Not only is the jury hearing it again, but you're lending credibility to that direct testimony by having it repeated again on the cross. Can I ask another question? Sure. It appears that the defense counsel filed a motion to have the defendant examined for fitness. Well, he was looking for a not guilty by reason of insanity at the time of the shooting. That's what he was having Dr. Klug, I believe, examine. Was Mr. Schultz also drinking or intoxicated? Because I think there was testimony that he was. She was very intoxicated. He had had maybe one drink that morning, I believe he said. I believe that's what it was. It was one drink that came out. Now, Tina Pickens had requested the state to dismiss the charges against Charlie, excuse me, against Eric, her husband. Now, my experience, Your Honor, has been that when an alleged victim comes forward and requests the state's attorney to dismiss charges, then that means that victim is either recanting, feeling responsible for what happened, and definitely going to be cooperating with defense. But in this case, Harry's trial counsel never even asked her why she requested that dismissal of the charges. And that just, to me... Well, maybe he knew. I mean, you're saying never asked her at trial. Right. Well, maybe he knew something that wasn't going to be helpful. Maybe, but like I said, in my experience, it may have been that if they request dismissal, they're with the defense. Or they're scared to death. Well, yes, I will say that's true, yeah, when you have instances like gang retaliation. Or domestic violence. Right. Now, you're aware that, you know, how you cross-examine a witness is normally a sound trial strategy, okay? But in this case, you will see that every cross-examination was basically a parody of the direct examination. Now, one other thing that I could not understand was every time trial counsel started to cross-examine, he would start it out with, if I understand your testimony, I just need to go over a few things just so I'm clear on all of this. I understand your testimony. Basically, those remarks are unnecessary and they're very damaging because what they do in the eyes of the jurors is you are lending credibility to that officer's direct testimony. Now, usually jurors want to see, you know, you go after a witness, but that's not what happened in Harry's case. Now, in the Lee case, if one of the basic rules is do no harm, another is don't repeat the direct. It doesn't do anybody any good. Now, the other problem was with his statement, okay? That was a hospital statement taken by two ISP agents a week after he had been released from Slim, I believe, in St. Louis. And surprisingly, the only true cross-examination that his trial counsel did was over this statement. But that is telling. What that tells us is that he clearly saw the damage that this statement was going to do to the defense. So he tried to discredit it through cross-examination. Those questions should have all been decided pre-trial, not in front of the juror. Clear. Sorry. You'll have the opportunity to look at the evidence. Yes, that's fine. Thank you. Ms. Shanahan. May it please the Court? Yes. Counsel, my name is Sharon Shanahan, and I represent the people of the state of Illinois. This is a case in where the defendant is telling us how appellate counsel would have tried the case with the benefit of perfect hindsight. That is not, however, the standard for determining whether trial counsel, who is an extremely experienced, capable attorney with decades of experience representing defendants in very serious crimes, is not saying how that's not the standard. So I was thinking about how to approach the beginning of this argument today, and I thought, you know what? I'll talk about Strickland, the Strickland standard. And we say the Strickland standard in about two sentences, reasonable attorney and prejudice. That's all we look at. Let's look at what the United States Supreme Court actually said. Judicial scrutiny of counsel's performance must be highly deferential. It is also tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is also easy for a court examining counsel's defense after it has been proven unsuccessful to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. That is, the defendant must overcome the presumption that under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. The advisability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance, and even willingness to serve, could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of the defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client. It is for these reasons that the Supreme Court said that we give such deference to the strategic decisions made by a trial counsel. You would agree, though, that an effective or reasonably qualified defense lawyer should object to the cumulative nature of five or eight witnesses that say the same thing? There were not that many witnesses saying the same thing. That's definitely not the case. We had several witnesses. Nobody saw this happen. Everybody was nearby, and everybody saw it from a different perspective. Some were there before the shooting. Some were there after the shooting. Some were north of the house. Some were south of the house. Some were actually behind the house. So we don't have the same people testifying to the same thing. Second of all, this was when the record in this case, it's really hard to follow where things are happening. I have an example here, but it's included in my brief. But it said, here, it's Officer Morris. He testifies that he was on South Market Street, near Allen Street, when he turned on his lights and proceeded to Defendant's House on South Van Buren Street. He saw Officer Cannon hop to park his squad car behind all three vehicles and then stand beside the gold car. He saw a black female lying on the step of the porch, and she was screaming. The black glass of the gold car shattered, and Officer Cannon ran behind the gold car while Officer Morris took cover behind the car. Do you have a real good idea of what was happening right now? Because I didn't when I read it. Was that direct or cross? Well, my point is, the reason this is not cumulative testimony, I have a two-part answer. The reason that what the state was doing was not cumulative is because it was important to let an officer testify as to what happened. Then they had one of these smart boards that they have where they show, for the most part, videos and then some pictures. I've included just a couple in the appendix to my brief to where you can then look at the gold car and where it is in relation to the truck. So that's part of the alleged redundancy is we're not in the courtroom seeing what's displayed on the screen there. We're just reading full facts. And to say I was next to that gold car when it's being shown on the screen. And as to the second part of your question about the cross-examination, this is not, and that's not what this defense counsel was doing. He has a style. He says, so what you're telling me is, and then through his cross-examination, he might let that just go right smoothly through. And then when another witness comes along, he takes what the other person told him on cross-examination and it conflicts with what somebody else says on cross-examination. And that was his method of taking a little part of what somebody said in direct, pointing to it in cross-examination, and then bringing out the discrepancy between what someone else testified to when they testified. So it's a, it's no more than a style. The word, so what you're telling me is, does not accurately reflect the defense counsel's, this notion that he is just repeating what was said on direct. Did the state ever object to the defense commenting on the testimony of another witness? It was done in proper impeachment form. Oh, okay. So when you have. Okay, I understand. Okay. Thank you. I would like to discuss the next, the opening statement. And this whole issue is completely, as far as the defendant is concerned, tied to People v. Lee. People v. Lee is a very unique case, really falling on a crime rather than strictly. In People v. Lee, the defense counsel, first of all, he failed to investigate the prior mental difficulties of the witness against his client. And the guy had a lot of mental problems, the state's witness. He failed to call a psychologist who could have testified that that crucial witness for the state was mentally retarded and easily led. And he did this not because he was not aware of the information he was. He just kind of let this trial sneak up on him and forgot to contact him and forgot to subpoena him and he didn't pay the psychologist. When this very impeachable witness for the state is on the stand, he actually, he didn't even begin to effectively cross-examine him, despite the fact that this witness made four prior statements to the police and it was only in the fourth one that he had implicated the defendant. He let, in his cross-examination, he let this witness recite facts harmful to the defendant. He even got a statement that was beneficial to his client and then three more questioning got him to basically recant his own helpful statement. He called the defendant to the stand without preparing her at all. She made a statement three years earlier and he never even showed it to her or talked to her about it. He did, in his closing argument, he didn't bring out even the most obvious questions about the defendant's relationship with this statement. And keep in mind, this is a case that had been, the witness had been tried in federal court. And the defense counsel knew, he had the transcripts, he knew exactly what, all the facts that were going on in this case. Wait, I'm sorry, who had been tried in federal court? In People v. Lee. Oh, wait, okay. There had been a... So there was a... So that defense counsel knew exactly, I mean he had everything laid out for perfect impeachment and he didn't do it. Now counsel for the defendant says it doesn't matter that Lee is a post-conviction case. I disagree because in Lee we had the testimony of the trial counsel. He got on the stand under oath and he said, I did this, I didn't do this, I knew this, I didn't know this, I had the transcripts, I read the transcripts, I didn't call the doctor. We were not speculating. We knew what that attorney knew and what he didn't know because he testified to it. All we know in this case is what he actually did. We cannot rely on speculation by defendant on appeal as, well, probably. Justice Chapman, you pointed out that we don't know whether the counsel for the defendant actually knew something and made a decision. For example, kind of briefly skipping forward to another point with the question about whether the defendant should testify. We don't know. Counsel for the defendant says he had nothing to lose by not testifying. How do we know? How do we know? Mr. Broeking may have known that if he put Harry Shaw on the stand, Harry may have said all sorts of incriminating things. He may have made things so much worse for him. We don't know. What about the opening statement? Was it essentially waived and totaled? It was waived, but first of all, it's kind of a two-part thing here. One is reserving it. What about the reservation? That's what I'm asking about. Well, the cases cited in Spade's brief show that reserving or even totally not giving an opening statement is not an effective assistance of counsel. And People v. Rooney says choosing to make or waive an opening statement on behalf of a defendant is simply a question of judgment and strategy. And if counsel chooses to forego making such a statement, it certainly cannot be said to be a reflection on his professional competence. Now, in this case, he reserved it. There are sound strategic reasons for doing that. That's what I was asking. What then came out when he did give his opening? I mean, is it just as she said? Yes, pretty much. But we have a few points I'd like to make here is that, for example, as cited in our brief, People v. Whittaker, a decision to delay or even forego an opening statement is a tactical choice made by counsel. Two reasons that are both, I think, applicable to this case. To avoid making an advanced disclosure of his trial strategy, and the other one is for the decision on whether the defendant will testify as a witness. And I'm going to jump to yet another issue, because I think this is relevant here. And that's this statement that Harry made to the police officers in the hospital. It's clearly not the question required to be recorded, and so I'm not even going to discuss that. But defense counsel says that that statement destroyed Harry's defenses of self-defense and recklessness. I would say that that statement supported, gave the excellent support for Harry's claim of self-defense and helped him. And maybe, I mean, this is why I say a decision can be made after you see what the state presents. In his statement to the police, Harry told the police that Tina had a bad temper, that she had attacked him in the past with a candlestick and a knife. He said that just prior to the shooting, Tina was standing behind him as they were yelling at each other, and then he remembered his midsection hurting a lot. So it's that portion of that statement gives a really good basis for the self-defense argument, without having to put what defense counsel may have known to be a very questionable person on the stand, where he could be exposed to cross-examination that may have severely harmed his case. There's no question that he wanted to testify, and counsel kept him off. Oh, absolutely not. The record is crystal clear, as it usually is, that it's on the record. He said that they had discussed it, and they had made the decision that Harry would not testify. And as we know, that was Harry's decision to make, to say that defense counsel should have insisted that he testify. It's not defense counsel's claim to make. And again, we are dealing with information that is not available. We don't know what defense counsel knew about Harry. We don't know what defense counsel knew about Tina. Let's talk about Tina here for a minute. Tina was extraordinarily drunk. Tina never said that she remembered a police officer shooting her. Tina said, I don't remember the shooting at all. Did she have her blood alcohol drawn? Yes. And I'm not sure whether it's in the record, because they were taken to Heartland Hospital in Marion, and then she was sent to St. Louis, so I'm not sure whether that was done there. Because none of the St. Louis medical records were in that record on appeal. But I don't think any, even in our argument here this afternoon, defense counsel said that she was very intoxicated. And so she says, and in fact, the defendant's statement of fact says that Tina was intoxicated, and she could not recall how she was shot in the neck. And what may have happened, although it's not entirely clear, this was a police shooting, and police are meticulous about the firing of a police firearm. And by the way, one officer shot his gun. Only one. But what about the missing bullet? When questioned about that, Officer Molopar said that he had not checked his, I don't know my language about guns too well, but he had not checked the clip, I guess is what I recall, in a while. And so there could have been one missing when he came that day. But there was uncontradicted testimony that only one shot was fired. The police officer that was shot himself never fired his gun. And he was shot before Officer Molopar fired his gun. So the police officer, Cannon, received his gun. Here's an interesting thing. The bullet, they believe, went through his, because apparently in a position with both hands like this, the bullet went through his hand and into his cheek. So it was one shot that went through his hand and his cheek. But he never fired his gun. It was in an effort to save Officer Cannon and the other police officers that were on the north side of the house that Officer Molopar fired one shot, which took Harry down. He was back from the hospital in St. Louis in less than a week. He was in rehab and that's when the police officers spoke to him. So Tina, like I said, she did not say a police officer shot her. It appears that in investigating the case, which is obviously the appropriate thing to do, they talked to her and told her that they were, I'm speculating too much about what's not. Somebody, in investigating the shooting, someone spoke to Tina. And according to Tina, someone said to her they were trying to figure out whether her shot had come from a police officer's gun. That's a long way from saying that a police officer shot Tina. And there is no other evidence to support that claim. That's all she said was that the police talked to her and said that they were investigating whether this could have happened. So she definitely didn't, isn't a sterling witness. This was a very, very contentious marriage. There was a great deal of abuse on both sides. And as is often the case, after an incident is over with, after you're sobered up, you end up back together. Thank you, Ms. Shanahan. I don't think there are any questions. Ms. Kavanagh, do you have a vote? Yes, very shortly. Thank you. I'd like to mention as far as Officer Scott Morris' repeated testimony. He first said that when he got there, he saw a woman laying on the porch underneath Harry Shaw. The second time he testified, he clarified it now, saying she was screaming for help. She was never asked that. Also, he also said, I heard Officer Cannon give a command to put your gun down. That was the first time he testified to it. The second time he testified, he added, I heard him say, give a loud verbal command to put the gun down. Now the third time he says it, is on the cross, Harry's own attorney elicits from Officer Morris, and you stated Officer Cannon made some command to the best of your recollection, put the gun down, that type of thing? Yes. And your description was that he yelled it out very loud? Yes. And that was the end of the cross-examination. That didn't help Harry out at all. That was actually very damaging to Harry's case. Now, in that statement, he is alleged to have said that he must have been the only one with the gun, so he must have shot Tina. And that he looked Officer Cannon dead in the eye, but he didn't remember any shooting. Now, I'm going to tell you, as far as that statement is concerned, Harry Schaaf said no less than four times he could not remember the shooting. Okay? Four times he said that. Three times he told Ben Parks, I can't see without my eyeglasses. And if you look at the PSI, you'll see he lost total vision in his left eye, 50% in his right eye. But they still insisted on taking that statement from him. They never asked him whether he was still under doctor care, what kind of medication he was taking. They simply said, oh, he was coherent, he was alert, and that was good enough for us. And so by letting this statement come in, saying, oh, he also twice said, I must have done what they told me I did. Who? Who's they? We don't know. But he wasn't basing his statement on what he could remember. There were outer influences here, and that's what should have been challenged vigorously at the pretrial level. That opening statement, as you can tell from this case, was critical. The jury had to know at the earliest point in the case what Harry Schaaf's defenses were. They had no clue until 37 witnesses later in closing argument, that's when they find out. That is too late. He should have told them in the opening, and as it's very clearly said in Lee, about the importance of an opening, sincerity, candor, and preparation that you show in an opening statement can set the tone of the trial. If you establish a rapport with the jury, the entire trial may tip in your client's favor. This was a 62-year-old man married to a younger woman for less than a year. And if you look at the PSI, Harry Schaaf told the probation department all about her alcohol, her violence, her mixing psychotropic meds with alcohol. He said he went to Marion police several times complaining, what can I do? He even went to attorney Winston Throgmorton and asked, what can I do about Tina? Now why didn't his trial lawyer present any witnesses to support that self-defense theory? He didn't have to use that statement to get violent acts of behavior in. Harry should have told him. If Harry told probation, I'm sure Harry told his attorney. But his attorney didn't think the case was going to go to trial. And he sat in jail for almost a year, and his attorney did nothing to prepare for this case. It is absolutely horrible that his opening was, this is obviously one of the longer trials we do here at Williamson County. To me, that clearly says that because of the abundance of evidence against my client, that made this trial unusually long. And then to say we have one further witness that needs to be presented, one defense witness. Now there were witnesses that said they saw an officer on Hartwell Street, who was Brian Maleta, the one with 47 rounds. They saw his gun recoiled twice. Shell casings can be picked up. Then we found one shell casing from Officer Maleta's gun. Shell casings can be picked up. Thank you. Thank you. Thank you both for your arguments and briefs, and we'll take the matter under advisory. Thank you very much.